IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| TONY ROACH, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | 2:02-CV-0042 |
| | § | **Capital Litigant** |
| DOUGLAS DRETKE, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent.[1] | § | |


## REPORT AND RECOMMENDATION
## TO DENY PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner TONY ROACH has filed a Petition for a Writ of Habeas Corpus by a Person in

State Custody challenging his conviction for capital murder and death sentence out of the 47th

Judicial District Court of Potter County, Texas.  For the reasons hereinafter expressed, the

Magistrate Judge is of the opinion petitioner's application for federal habeas corpus relief should

be DENIED.


I.
PROCEDURAL HISTORY

A jury convicted petitioner of capital murder, and his punishment was assessed at death

by lethal injection.  *State v. Roach*, Cause No. 39,395-A (47th District Court of Potter County,

Tex. June 7, 1999).  The case was appealed to the Texas Court of Criminal Appeals, and the

---

[1]Effective August 21, 2003, the Texas Department of Criminal Justice, Institutional Division was changed to the
Correctional Institutions Division, and Douglas Dretke was named the Director.  The caption is being changed pursuant to Fed.
R. Civ. P. 25(d).

Court of Criminal Appeals affirmed the conviction and death sentence in an unpublished

opinion.  *Roach v. State*, No. 73,529 (Tex. Crim. App. Nov. 7, 2001).  Petitioner filed a state

application for writ of habeas corpus on December 14, 2000.  The trial court entered findings of

fact and conclusions of law on June 13, 2001, recommending relief be denied.  On January 9,

2002, the Texas Court of Criminal Appeals denied relief in a written order based on the findings

of the trial court and its own review.  *Ex parte Roach*, No. 49,658-01 (Tex. Crim. App. Jan. 9,

2002).

Petitioner filed his federal petition for writ of habeas corpus on July 19, 2002.

Respondent filed an answer on November 4, 2002, accompanied by the state court records.


II.
EXHAUSTION OF STATE COURT REMEDIES

In his answer to the petition, respondent advises petitioner has satisfactorily exhausted all

available state court remedies as required by 28 U.S.C. § 2254(b), (c) with regard to all grounds.

Accordingly, respondent does not seek dismissal of the application for writ of habeas corpus on

that basis.

It is the opinion of the undersigned Magistrate Judge that this Court should consider

petitioner to have exhausted his available state court remedies and that the instant habeas

application should not be dismissed for failure to exhaust.


III.
ISSUES

Petitioner raises the following eleven claims in support of his petition:

A.      Petitioner's rights under the Eighth and Fourteenth Amendments will be
        violated because, under Texas law, there is no determination prior to

execution on the issue of whether or not a defendant has been rehabilitated;

B.      Petitioner's execution under the Texas capital clemency procedures would violate his rights under the Eighth and Fourteenth Amendments;

C.      Petitioner's execution under current Texas capital clemency procedures would violate the International Covenant on Civil and Political Rights;

D.      Petitioner's rights under the Eighth and Fourteenth Amendments were violated because Texas's capital sentencing statute does not permit meaningful appellate review;

E.      Petitioner's sentencing, pursuant to Article 37.071 of the Texas Code of Criminal Procedure, violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments;

F.      Petitioner's conviction and sentence, pursuant to Section 19.03 of the Texas Penal Code and Article 37.071 of the Texas Code of Criminal Procedure, violated his rights under the Establishment Clause of the First Amendment;

G.      The death sentence against petitioner violates his right under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment;

H.      Petitioner's rights under the Eighth and Fourteenth Amendments were violated because Texas statutory law prevents jurors from knowing the effect of one hold-out juror;

I.      The trial court violated petitioner's rights under the Eighth and Fourteenth Amendments by failing to properly define mitigating evidence in the jury charge;

J.      Petitioner was deprived of his right to testify during the punishment phase of the trial in violation of his Fifth, Sixth, and Fourteenth Amendments; and

K.      Petitioner's appellate counsel's conflict of interest deprived petitioner of his Sixth Amendment right to effective assistance of counsel.

Petitioner also asserts that he is entitled to an evidentiary hearing in this Court on all of these

claims.

IV.
STANDARD OF REVIEW

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the

AEDPA), 28 U.S.C. § 2254, provide:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a state court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of
> the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d) (2000).

Section 2254(d)(1) concerns pure questions of law as well as mixed questions of law and

fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001). Under the

"contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court

arrives at a conclusion opposite to that reached by the United States Supreme Court on a

question of law or if the state court decides a case differently from the United States Supreme

Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13

(2000). With respect to the "unreasonable application" clause, a federal court may grant a writ

of habeas corpus if the state court identifies the correct governing legal principle from the United

States Supreme Court's decisions, but unreasonably applies that principle to the facts of the

prisoner's case. *Williams*, 529 U.S. at 413. Under *Williams*, a state court unreasonably applies

Supreme Court precedent if it "unreasonably extends a legal precedent from [Supreme Court]

precedent to a new context where it should not apply or unreasonably refuses to extend that

principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2001). Under section 2254(d)(2), federal courts "give deference to the state court's findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir.) (as modified on denial of rehearing), *cert. denied*, 531 U.S. 1002 (2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This statute applies to all federal habeas corpus petitions which, as with the instant case, were filed after April 24, 1996, provided that they were adjudicated on the merits in state court. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Resolution on the merits in the habeas corpus context is a term of art that refers to the state court's disposition of the case on substantive rather than procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

V.
FACTUAL BACKGROUND

The body of Ronnie "Kitten" Hewitt was found by firefighters inside of her burning apartment in Amarillo, Texas on June 8, 1998. There was a belt tightened around her neck. (R. 21:75-78, 135). Although her body had sustained burns from the fire, it was subsequently determined that she died from asphyxiation from being choked with the belt and that someone had set the fire in the apartment after her death, using what appeared to be aerosol hair spray as an accelerant. (R. 21:116-20, 149-54, 164-75; R. 22:36-37, 41). Due to her state of undress and

the position of her body, police officials at the scene believed that she might have also been sexually assaulted.  (R. 23:38-41).

On June 18, 1998, petitioner was questioned by police officers in Guymon, Oklahoma, about his involvement in the theft of a bicycle in that town.  During this questioning, petitioner confessed to killing a woman named Kitten in Amarillo, Texas.  (R. 22:55-60, 98-110). Petitioner subsequently signed a detailed, written confession, in which he stated that he had entered Hewitt's apartment through a bedroom window.  After seeing that there was a woman in the apartment, he hid in the bathroom for a period of time and then walked out and confronted the victim.  When she began screaming, petitioner placed his hand over her mouth and told her that he was not going to hurt her.  Petitioner further stated in his statement that, after the victim began to scream again and kicked and scratched at him, he choked her first with his arm and then with a belt.  After he made sure that she was dead, he then raped her both vaginally and anally, took money, a knife, and a beer from the apartment, took rings from the victim's fingers, and poured hair spray on some items and set the apartment on fire.  (R. 30:State's Exhibit #504A).

A knife identified as belonging to the victim was retrieved from a pawn shop in Guymon

(R. 22:62; R. 23:22), and two of the victim's rings were retrieved from a pawn shop in Amarillo. (R. 23:9-10, 21).  Petitioner had signed pawn slips at both locations for these items.  (R. 22:169, 178-82, 185-94).  Vaginal, anal, and oral swabs were taken from the victim.  Semen was present in both the vaginal and anal swabs.  Petitioner was excluded as the contributor of the semen found in the vaginal swab, but could not be excluded as the contributor of the semen found in the anal swab.  (R. 23:41; R. 24:97-100).  The DNA profile of the contributor of the semen found in

the anal swab matched petitioner's DNA in 10 different areas, and this DNA profile would occur in only 1 in 6 billion Caucasians, Blacks, or Hispanics.  (R. 24:110-12).

VI.
EXAMINATION OF THE ISSUES

A.
Claims Attacking Execution

In his first, second, and third grounds for relief, petitioner claims his execution would violate his constitutional rights in various respects.  In his first ground, petitioner asserts executing him without a future determination of whether or not he has been rehabilitated would violate his rights under the Eighth and Fourteenth Amendments.  In his second ground, petitioner contends the capital clemency procedures in place in Texas are unconstitutional under the Eighth and Fourteenth Amendments.  In his third ground, petitioner argues his execution under the current Texas capital clemency procedures would violate the International Covenant on Civil and Political Rights (ICCPR).[2]

1.   First Ground for Relief

Citing *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976),

---

[2]In addition to arguing that these three claims are meritless, the State also argues that they are not yet ripe for review because petitioner's execution date has not yet been set.  The Supreme Court has explained that a claim is not ripe for adjudication if it rests on contingent events that may not occur as anticipated, if at all.  *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998), *citing Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580-81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985).  Moreover, in order to determine whether an issue is ripe, a reviewing court should evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.  *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).  The Fifth Circuit has also stated that a case is generally ripe for review if any remaining questions are purely legal ones, whereas a case is not ripe for review if further factual development is required.  *United Transportation Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000), *citing New Orleans Public Service, Inc. v. Council of New Orleans*, 833 F.2d 583, 586-87 (5th Cir. 1987).

In the instant case, it is true that petitioner's execution date has not been set and, should some court other than this one grant him relief or should some other intervening event occur, it might not be set in the future.  On the other hand, in these three grounds for relief, petitioner makes solely legal attacks on the Texas capital murder statutes and clemency process which require no further factual development in order for this Court to reach a decision.  Should this Court choose to dismiss these claims on the basis that they are not yet ripe for review, petitioner would be required to seek permission from the Fifth Circuit before bringing these claims before this Court once again after an execution date has been set.  *See* 28 U.S.C. § 2244(b)(3)(A).  As there is no certainty that this permission would be granted, this might create a hardship for petitioner.  Accordingly, in an abundance of caution, this Court will assume, without deciding, that these grounds are ripe for review and will decide them on their merits.

petitioner contends his execution, without a future determination of his possible rehabilitation, would constitute cruel and unusual punishment because it would be the equivalent of a "mandatory" death sentence.  In *Woodson*, the Supreme Court invalidated a North Carolina statute that provided for an automatic death sentence for a conviction for first-degree murder. The Court held the statute constituted cruel and unusual punishment because, in part, it failed to require the consideration of the character and record of each convicted defendant, as well as the circumstances of the particular offense.  *Id*. at 303-04.  Unlike *Woodson*, and contrary to petitioner's contention, in reaching its decision on punishment, the jury in petitioner's case was required to, and was specifically instructed to, consider all evidence offered at trial, including the circumstances of the offense, petitioner's background, and petitioner's character.  After considering this evidence, before it sentenced petitioner to death, the jury had to find unanimously, and beyond a reasonable doubt, that there was a probability that petitioner would commit future criminal acts of violence that would constitute a continuing threat to society. Moreover, the jury had to find, unanimously, that there was nothing about the circumstances of the offense, petitioner's character or background, or his personal moral culpability that mitigated against the death penalty such that a life sentence was warranted. (Tr. 3:691, 696-97).  The jury in petitioner's case was required to consider all of the evidence the Supreme Court in *Woodson* held was relevant in sentencing a person to death.  Petitioner has cited no Supreme Court case law requiring a second, or further, inquiry into his character.  In denying this ground for relief at the state level, the state habeas court concluded that Texas law required the jury to consider the character and record of petitioner and that petitioner had not shown how the application of Texas law was unconstitutional as applied to him.  (State Habeas Transcript:349).  These conclusions

by the state habeas court did not result in a decision contrary to federal law.

2.      Second Ground for Relief

Regarding the Texas clemency procedure itself, petitioner contends in his second ground for relief that his execution, after review under the current Texas clemency procedures, would violate his due process rights and constitute cruel and unusual punishment.  Petitioner asserts the Texas clemency process violates the federal constitution because the Texas Board of Pardon and Paroles does not give any "serious consideration" to any grounds for clemency other than actual innocence.  Specifically, petitioner asserts Texas does not grant clemency to persons with serious mental illness, persons with mental retardation, or persons who have been rehabilitated.

Petitioner contends that while Texas has established procedures for addressing clemency applications, these procedures do not pass constitutional muster under *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998).  In *Woodard*, the opinion of the Court, authored by Chief Justice Rehnquist joined by three other justices, expressed the view that Ohio's clemency process, whereby a board makes a recommendation but the discretion to grant clemency lies in the hands of the governor, does not violate the due process clause of the federal constitution.  This is because an inmate under a death sentence, having no constitutional right to clemency as it is a "unilateral hope," has no due process interest in the clemency proceeding itself.  *Id.* at 280-81.  Justice O'Connor authored a concurring opinion, joined by three other justices, stating the view that the due process clause of the U.S. Constitution did require that "minimal" procedural safeguards exist in a state's clemency process, such that judicial intervention might be warranted where an official merely flipped a coin in order to determine whether to grant clemency, or where the State arbitrarily denied a

condemned prisoner *any* access to the clemency process.  *Id*. at 288-89.  Nonetheless, these four justices agreed that Ohio's clemency process did not violate Woodard's due process rights. *Id*. at 290.

As these two opinions make clear, eight justices of the United States Supreme Court have expressed the view that a prisoner under a death sentence is, at most, entitled to access to a clemency process where the decision whether to grant clemency is not decided in an arbitrary manner.  While petitioner has pointed to aspects of the Texas clemency process with which he disagrees, there is no evidence he will be denied access to the process when the time comes, nor is there evidence the decision will be made in an arbitrary manner.  Petitioner has failed to show Texas's clemency process violates his due process rights.  Indeed, the Fifth Circuit, citing *Woodard* as authority, has held the Texas clemency procedures do not violate due process. *Faulder v. Texas Board of Pardons and Paroles*, 178 F.3d 343, 344-45 (5th Cir.), *cert. denied*, 527 U.S. 1017 (1999); *Moody v. Rodriguez*, 164 F.3d 893 (5th Cir. 1999).  Moreover, regarding petitioner's contention that the clemency procedure is unconstitutional because Texas does not grant clemency to those suffering from severe mental illnesses or retardation, Supreme Court precedent makes clear that it is cruel and unusual punishment to execute anyone who is mentally retarded or who is so severely mentally disturbed that he does not understand that he is to be executed and the reason for the execution.  *See Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).  It is unnecessary for the Texas clemency process to make special provisions for consideration of these types of inmates.  The federal constitution does not require a re-consideration of an inmate's possible rehabilitation prior to execution.  The state habeas court

concluded that petitioner's execution under the current Texas capital clemency procedures does not violate the Eighth and Fourteenth Amendments.  (SHTr.:349).  Given the language in the concurring opinion of *Woodard*, as well as Fifth Circuit case law on this issue, this conclusion is not an unreasonable application of federal law.

3.      <u>Third Ground for Relief</u>

Petitioner further insists Texas's clemency process violates the International Covenant on Civil and Political Rights (ICCPR), ratified by the United States in 1992.  He contends the clemency process violates article six of that document, which states that every person sentenced to death shall have the right to seek a pardon or commutation of the sentence and that amnesty, pardon, or commutation is available in *all* cases.  *See* INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS, *opened for signature* 19 Dec. 1966, 999 U.N.T.S. 171 (1967) (entered into force Mar. 23, 1976); *see also* 138 Cong. Rec. S4783-84 (daily ed. Apr. 2, 1992).  As discussed earlier, Texas does have a clemency process during which any person condemned to death has the right to seek a full pardon or a commutation of the sentence, and petitioner has failed to show how this clemency process violates international law.  Indeed, as noted by the First, Fifth and Sixth Circuits, when the Senate ratified the ICCPR in 1992, it declared that articles one (1) through twenty-seven (27) in the document were not self-executing, meaning they could not be in effect as law in the United States without action by Congress incorporating the provisions of the covenant into domestic law.  Congress has not implemented the legislation necessary to make the covenant binding law on federal courts.  *Buell v. Mitchell*, 274 F.3d 337, 371-72 (6th Cir. 2001); *Beazley v. Johnson*, 242 F.3d 248, 267 (5th Cir.  2001); *Igartua De La Rosa v. United States*, 32 F.3d 8, 10 n. 1 (1st Cir. 1994).  Therefore, even if Texas's clemency process did not

meet the requirements of the covenant, petitioner would not be entitled to habeas relief on this

claim since the international covenant is not binding on this Court.  The state habeas court

concluded that the ICCPR has not been violated in the instant case.  (SHTr.:350).  This

conclusion does not result in a decision that is contrary to federal law.

Petitioner's first, second, and third grounds for relief are without merit, and it is

recommended they be denied.

B.

Appellate Review Claim

In his fourth ground for relief, petitioner alleges his rights under the Eighth and

Fourteenth Amendments were violated because Texas does not have meaningful appellate

review of death sentences.  Specifically, petitioner contends the review is constitutionally

inadequate because Texas case law does not provide for appellate review of the mitigation

special issue that jurors are required to answer in death penalty cases.

Pursuant to Article 37.071 of the Texas Code of Criminal Procedure, the jury was

required to answer the following two special issues at the punishment phase of petitioner's trial:

> Do you find from the evidence beyond a reasonable doubt that there is a
> probability that the Defendant, TONY ROACH would commit criminal acts of
> violence that would constitute a continuing threat to society?
>
> Taking into consideration all of the evidence, including the circumstances of the
> offense, the defendant's character and background, and the personal moral
> culpability of the defendant, do you find that there is a sufficient mitigating
> circumstance or circumstances to warrant that a sentence of life imprisonment
> rather than a death sentence be imposed?

(Transcript, vol. 3:696-97); *see* TEX. CRIM. PROC. CODE ANN. art. 37.071 § 2(b), (e)(1) (Vernon

1991).  The Court of Criminal Appeals has consistently held that a sufficiency review of the

second special issue is both inappropriate and not constitutionally required.  *See Colella v. State*,

915 S.W.2d 834 (Tex. Crim. App. 1995).  Petitioner contends, however, that the absence of

appellate review of the mitigation special issue violates his constitutional rights under the Eighth

and Fourteenth Amendments because it prevents a meaningful appellate review of a death

sentence.

The mitigation special issue was added by the Texas legislature in response to the

Supreme Court's decision in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256

(1989).  *See Shannon v. State*, 942 S.W.2d 591, 598 (Tex. Crim. App. 1996).  In *Penry*, the

Supreme Court held that the jury in Penry's capital murder trial was unable to consider Penry's

mitigating evidence of mental retardation and childhood abuse through the special issues as they

existed at that time, because a juror could have believed that Penry committed the murder

deliberately and that he would be a future danger to society, but also could have believed he

should not be executed because of his retardation and the abuse he suffered.  Such a juror would

have been unable to vote to spare his life. *Penry*, 492 U.S. at 322-5.  In response to the State's

argument that a special mitigation issue would return to unbridled discretion on the jury's part,

an argument similar to the argument petitioner makes here, the Supreme Court disagreed and

stated that:

> To be sure, *Furman* held that "in order to minimize the risk that
> the death penalty would be imposed on a capriciously selected
> group of offenders, the decision to impose it had to be guided by
> standards so that the sentencing authority would focus on the
> particularized circumstances of the crime and the defendant."  But
> as we made clear in *Gregg*, so long as the class of murderers
> subject to capital punishment is narrowed, there is no
> constitutional infirmity in a procedure that allows a jury to
> recommend mercy based on the mitigating evidence introduced by
> a defendant.

*Penry*, 492 U.S. at 326-7 (quoting *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S.Ct. 2909, 49

L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)).

Subsequently, in *Tuilaepa v. California*, 512 U.S. 967, 974, 114 S.Ct. 2630, 129 L.Ed.2d

750 (1994), the Supreme Court noted that, "[i]n providing for individualized sentencing, it must

be recognized that the States may adopt capital sentencing processes that rely upon the jury, in

its sound judgment, to exercise wide discretion."  And, citing *Zant v. Stephens*, 462 U.S. 862,

875, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Court in *Tuilaepa* specifically stated that a

sentencer may be given unbridled discretion in determining whether to impose the death penalty

once it is determined that the defendant is a member of the class that is eligible to receive the

death penalty.  *Tuilaepa*, 512 U.S. at 979-980.  Thus, Supreme Court precedent has clearly held

that the mitigation special issue is constitutionally acceptable.

Petitioner, however, contends that appellate review of the sufficiency of the evidence to

support a *negative* answer to this special issue is constitutionally required.  The Supreme Court

has held that the Constitution does not require any appellate proportionality review of a death

sentence (either with other cases in which defendants received the death penalty or with cases in

which defendants did not receive the death penalty) where the statutory procedure adequately

channels the sentencer's discretion.  The Supreme Court has specifically stated that Texas has a

statutory scheme that adequately channels the sentencer's discretion.  *See McCleskey v. Kemp*,

481 U.S. 279, 306-7, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Pulley v. Harris*, 465 U.S. 37, 50-

1, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

In *Hughes v. Johnson*, 191 F.3d 607 (5th Cir. 1999), the Fifth Circuit applied *Pulley v.*

*Harris* in a case in which the petitioner argued that the Fourth and Eighth Amendments required

that the mitigating evidence in his case be examined "independently" on appeal in order to determine whether the petitioner was death-worthy.  The Fifth Circuit rejected this argument, stating that Hughes' argument was, in essence, an argument for a proportionality review of his case as compared to other death penalty cases because implicit in his argument was that other death penalty defendants did not have the same amount or type of mitigating evidence as he did. The Fifth Circuit held that, pursuant to *Pulley v. Harris*, an independent appellate review of mitigating evidence was not constitutionally required.  *Hughes*, 191 F.3d at 621-3.

Subsequently, in *Moore v. Johnson*, 225 F.3d 495, 505-06 (5th Cir. 2000), and in *Woods v. Cockrell*, 307 F.3d 353, 359-60 (5th Cir. 2002), the Fifth Circuit held that the fact that the Texas Court of Criminal Appeals does not conduct any appellate sufficiency review of the mitigation special issue does not violate a defendant's due process rights.  Citing *Tuilaepa v. California*, the Fifth Circuit held in both of those cases that the Texas Court of Criminal Appeals did not violate the federal constitution by declining to review the mitigation issue on appeal because, as required by the federal constitution, Texas jurors are given a vehicle, through the mitigating special issue, to consider relevant mitigating evidence and review of their unbridled discretion in this area is not required.  Thus, neither Supreme Court precedent nor Fifth Circuit interpretation of Supreme Court precedent dictates that petitioner was entitled to appellate review of the sufficiency of the evidence to support the jury's decision *not* to dispense mercy in his case.

The state habeas court made its conclusion that this ground for relief was without merit because neither the Eighth nor the Fourteenth Amendments require an appellate court to re-weigh punishment evidence.  (SHTr.:351).  Because Supreme Court precedent does not dictate

that appellate review of mitigating evidence is constitutionally required, the state court's denial

of this ground for relief was not a decision contrary to clearly established federal law.  This

ground for relief is without merit, and it is recommended that it be denied.

C.

Sentencing Procedure Claims

In his fifth, eighth, and ninth grounds for relief, petitioner asserts that the Texas statute

which governs the procedure in death penalty cases is unconstitutional in several respects.  In his

fifth ground petitioner claims the Texas sentencing statute and procedure are unconstitutional

because:  (1) prosecutors are given unfettered discretion in deciding whether to seek the death

penalty; (2) the terms and phrases in the punishment special issues are not adequately defined;

(3) the State does not have the burden of proof with respect to the mitigation special issue; and

(4) unadjudicated extraneous offenses are admissible at the punishment phase of the trial.[3]

In his eighth ground, petitioner asserts his rights under the Eighth and Fourteenth

Amendments were violated because Texas law prevents jurors from knowing the effect of one

hold-out juror at the punishment phase of the trial.

In his ninth ground, petitioner argues the definition of mitigating evidence in the jury

charge, pursuant to Texas statute, was unconstitutional under the Eighth and Fourteenth

Amendments because it did not encompass evidence regarding petitioner's potential for

rehabilitation.

1.      Fifth Ground for Relief

---

[3]Petitioner also makes several other blanket assertions of constitutional error in this ground for relief in a summary fashion.  This Court will not address these claims because they either do not concern the constitutionality of Article 37.071 of the Texas Code of Criminal Procedure, the topic of this ground for relief, or because they have been addressed in other grounds for relief raised by petitioner.

In his fifth ground for relief, petitioner asserts the Texas capital sentencing procedure is constitutionally infirm in several respects, including the fact that a prosecutor has the discretion to choose what cases in which to seek the death penalty, that the failure to require certain terms used in the punishment special issues to be defined in the jury instructions, the lack of a burden of proof with respect to the mitigation punishment issue, and the fact that unadjudicated offenses are admissible at the punishment phase of a capital murder trial. With regard to a prosecutor's discretion to seek the death penalty, the Supreme Court, in *Gregg v. Georgia*, rejected a claim that the Georgia capital punishment statute was unconstitutional because the state prosecutor had the discretion to decide whom to prosecute for capital murder and whether or not to offer a plea bargain to certain defendants. Rather, the Court noted that the Constitution requires that the decision to impose the death penalty must be guided by standards that require that the sentencing be based on the particularized circumstances of the crime and the defendant in question.[4] The Court re-affirmed this holding in *McCleskey v. Kemp*, noting again that opportunities for discretionary leniency by the State towards other defendants do not render a specific capital sentence arbitrary and capricious. Moreover, in *Pulley v. Harris*, the Supreme Court held the Eighth and Fourteenth Amendments do not require state courts to compare a death sentence imposed on one defendant with penalties imposed in similar cases. The Supreme Court has consistently rejected claims that capital murder schemes are unconstitutional because sentences sought and/or imposed on other defendants may differ.

As to petitioner's other attacks on the constitutionality of Article 37.071, the Fifth Circuit

---

[4]On the same day the Court issued its opinion in *Gregg v. Georgia*, it issued its opinion in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), upholding the constitutionality of the Texas state death penalty statute. The statute addressed in *Gregg* and the statute addressed in *Jurek* were adopted by the States of Georgia and Texas, respectively, after those states' prior death penalty statutes, considered by the Court in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), were held unconstitutional.

has consistently held that the terms included in the punishment special issue are not

unconstitutionally vague and can be understood in their common meaning. *Woods v. Johnson*,

75 F.3d 1017, 1033-34 (5th Cir. 1996) (noting the long line of Fifth Circuit cases holding that the

terms in the Texas punishment special issues need not be defined in the jury instructions); *James*

*v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir. 1993) (not necessary to define "deliberately,"

"probability," "criminal acts of violence," or continuing threat to society"); *Nethery v. Collins*,

993 F.2d 1154, 1162 (5th Cir. 1993) (not necessary to define "deliberately," "probability," or

"society").  Moreover, the Supreme Court has never held that the federal constitution requires

certain terms used in the two issues be given specific definitions.  The Fifth Circuit has also held

that, under Article 37.071, the burden of proof is not shifted to the defendant to prove the

existence of mitigating circumstances to warrant a life sentence. *Hughes v. Johnson*, 191 F.3d

607, 624-25 (5th Cir. 1999).  Even if the burden were on the defendant to prove the existence of

mitigating circumstances, the Supreme Court has held that this burden does not violate a capital

defendant's constitutional rights, so long as the State's burden to prove aggravating

circumstances to justify the death penalty is not lessened. *Walton v. Arizona*, 497 U.S. 639, 650,

110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *overruled on other grounds by Ring v. Arizona*, 536

U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2000).  Finally, the Fifth Circuit has

consistently stated that it does not violate a capital defendant's right to due process to admit

unadjudicated criminal conduct at the punishment phase of the trial. *Landry v. Lynaugh*, 844

F.2d 1117, 1121 (5th Cir. 1988); *Williams v. Lynaugh*, 814 F.2d 205, 208 (5th Cir. 1987).  In

addressing these issues at the state level, the state habeas court concluded that the Texas death

penalty statutes are not unconstitutional.  (SHTr.:352-53).  This conclusion was not a decision

that is contrary to federal law.

2.      Eighth Ground for Relief

In petitioner's eighth ground for relief, he alleges his rights under the Eighth and Fourteenth Amendments were violated because Texas law prevents jurors from knowing the effect of one hold-out juror at the punishment phase of the trial, that the jurors were instructed that they could not answer "yes" to the first special issue, regarding petitioner's future dangerousness, unless they unanimously agreed and could not answer it "no" unless ten or more jurors agreed on that answer, and that they could not answer the second question"yes" unless ten or more jurors agreed and could not answer it "no" unless the jurors unanimously agreed.  (Tr. 3:692-93).  This is commonly known as the "12-10" rule.  Petitioner contends Article 37.071(g) of the Texas Code of Criminal Procedure is unconstitutional under the Eighth and Fourteenth Amendments because it prevents  the attorney for the State, the defense attorney, or the trial judge from informing a juror or prospective juror of the effect of the failure of the jury to reach a verdict on either special issue, while 37.071(e) specifically states that the effect of a failure to so agree on either special issue is that the defendant will receive a life sentence.  *See* TEX. CODE CRIM. PROC. ANN.  37.071(g) (Vernon 1993)).

In *Jones v. United States*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), the United States Supreme Court addressed the question of whether a federal death penalty defendant's Eighth Amendment rights were violated because the jurors in the case were not given a jury instruction at the punishment phase of the trial regarding the consequences of a jury deadlock at punishment.  *Jones* was a federal death penalty case and, under the federal death penalty statute, the jury was required to consider all aggravating and mitigating factors and

determine whether the aggravating factors outweighed the mitigating factors.  All aggravating

factors in a federal death penalty case must be proven beyond a reasonable doubt, whereas the

jury may consider a mitigating circumstance so long as one juror finds that its existence has been

established by a preponderance of the evidence.  In *Jones*, the jury unanimously found the

existence of two statutory and two non-statutory aggravating factors beyond a reasonable doubt

and various jurors found the existence of ten mitigating factors.  After weighing all of these

factors, the jury unanimously recommended that Jones be sentenced to death.  The jury did not

receive an instruction requested by the defense which informed the jurors that if they were

unable to reach a unanimous decision with regard to the sentence to be imposed, the judge

should be so informed and would then impose a sentence of life imprisonment without

possibility of parole.  *Jones*, 527 U.S. at 376-80.

Although the Supreme Court in *Jones* acknowledged it had previously held a death

sentence could not be imposed arbitrarily, that a jury must be given a vehicle in which all

relevant mitigating evidence may be considered at the punishment phase of a capital murder

trial, and that a jury cannot affirmatively be misled regarding its role in the sentencing process,

the Court held the Eighth Amendment was not violated simply because the jury was not

informed of the consequences of a deadlock on the issue of punishment.  Specifically, the Court

held the federal constitution was not violated because:  1) the jury in Jones's case was not misled

about its role at punishment; 2) the object of the jury system is to secure unanimity by a dialogue

among the jurors; and 3) in a capital sentencing proceeding, the government has a strong interest

in having the jury express the conscience of the community that might be undermined if the jury

was informed about the consequences of a deadlock.  *Id.*  at 382.  Moreover, although four

justices dissented in *Jones* because they believed an instruction regarding the effect of a jury

deadlock was constitutionally required in the case, the dissenting opinion, authored by Justice

Ginsburg, did not dispute that the Eighth Amendment does not require that a jury be instructed

as to the consequences of a failure to agree but, instead, argued that such an instruction was

necessary in *Jones* because of particular instructions given to the jury in that case which, the

dissent argued, created a reasonable probability that the jurors in that case mistakenly believed

that Jones could be sentenced to something less than life without parole for his crime.  *Jones,*

527 U.S. at 418, n. 20.  Thus, because those instructions were peculiar to that case, both the

majority and the dissenting opinions in *Jones* make clear that the Supreme Court does not

consider it a requirement of the Eighth Amendment that a capital jury be informed of the

consequences of a failure to agree with respect to its verdict at the punishment phase of the trial.

Since *Jones* was handed down by the Supreme Court, the Fifth Circuit has held that an

argument that the "12-10" rule in Texas violated a capital murder defendant's Eighth and

Fourteenth Amendments was without merit.  *Alexander v. Johnson*, 211 F.3d 895, 897, n. 5 (5th

Cir. 2000).  Moreover, the Fifth Circuit has also consistently held that any ruling that the "12-10"

rule violated the federal constitution would be a new rule as defined in *Teague v. Lane* that could

not form the basis for federal habeas corpus relief.  *See Alexander*, 211 F.3d at 897; *Davis v.

Scott*, 51 F.3d 457, 467 (5th Cir. 1995); *Webb v. Collins*, 2 F.3d 93 (5th Cir. 1993).   When it

addressed this issue at the state level, the state habeas court concluded the Constitution does not

require juries to be informed as to the effect of a failure to reach an unanimous agreement on the

punishment special issues.  (SHTr.:355).  This conclusion is not an unreasonable application of

federal law.

3.      Ninth Ground for Relief

In petitioner's ninth ground for relief, he contends the definition of mitigating evidence in the jury charge was unconstitutional because it did not encompass evidence regarding petitioner's potential for rehabilitation.  The jurors in petitioner's case, however, were instructed that, in answering the special issues, they should consider all evidence submitted to them in both phases of the trial.  (Tr. 3:689).  The jurors were also instructed that, in answering the mitigation special issue, they should consider mitigating evidence "to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."  (Tr. 3:693).  The Fifth Circuit has held that this definition of mitigating evidence does not unconstitutionally limit or preclude the consideration of any mitigating evidence which might have a bearing on a defendant's moral culpability.  *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001).  Accordingly, the fact that petitioner's potential for rehabilitation was not specifically included in the jury instructions as being a particular type of mitigating evidence did not violate petitioner's constitutional rights.

The state habeas court concluded that the statutory definition of "mitigating evidence" given to the jury in the jury instructions was not constitutionally infirm.  (SHTr.:355).  This conclusion is not an unreasonable application of federal law.  Petitioner's fifth, eighth, and ninth grounds for relief are without merit, and it is recommended they be denied.

D.
Establishment Clause Claims

In his sixth ground for relief, petitioner argues the Texas capital murder and death penalty statutes are unconstitutional because they violate the Establishment Clause of the First Amendment.  Petitioner asserts these statutes violate the prohibition against government

established religion because the sponsors of the Texas bills which created these statutes gave only religious reasons for imposing the death penalty as punishment. In his seventh ground for relief, petitioner alleges the death sentence against him violates his right under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment. Specifically, he argues the Texas death penalty statutes are void under the Establishment Clause of the First Amendment and, as a consequence, violate his right to be free from cruel and unusual punishment.

In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court addressed the question of whether a statute passes constitutional muster with respect to the Establishment Clause of the First Amendment. The court held that, first, the statute must have a secular, legislative purpose. Second, its principal or primary effect must neither advance nor inhibit religion. Finally, the statute must not foster an excessive government entanglement with religion. *Id.* at 612. Petitioner contends Section 19.03 of the Texas Penal Code, the statute which sets forth the elements of capital murder, and Article 37.071 of the Texas Code of Criminal Procedure, the statute that governs the procedure to be used during the punishment phase of a death penalty trial, fail this test because these statutes do not have a secular, legislative purpose.

In support of this claim, petitioner points to the debates which took place in the Texas House of Representatives when these statutes were initially enacted in 1973. Petitioner has included a transcript of the closing arguments in these debates as an exhibit. Review of this transcript reveals several representatives spoke during closing arguments. Representatives Washington and Leland spoke against the passage of the statutes, arguing the death penalty was not an appropriate punishment. Representative Washington argued there was no evidence the

death penalty was a deterrent to crime and that there was the danger an innocent person would be executed.  Representative Leland also spoke against the bill, quoting two passages from the Bible, one being the commandment against killing and one referencing that the merciful would be blessed.  (Petitioner's Exhibit E, pp. 1-3).  Subsequently, Representatives Cobb and Williamson argued in favor of the bill authorizing the death penalty as a punishment for certain classes of murder.  In his statement, given immediately after Leland's statement, Cobb initially stated that "if Biblical references are going to be the basis on which this appeal is made," and then proceeded to recite several quotes from the Bible in support of the death penalty.  (Exhibit E, p. 3).  Representative Williamson then spoke, arguing that the Ten Commandments were directed towards individuals, not the State, and arguing that capital punishment was permitted under Mosaic Law.  (Exhibit E, p. 3-4).  Finally, Representative Hollowell, arguing in favor of the bill, stated that, according to an article from the American Bar Association, law enforcement officers do believe the death penalty has a deterrent effect.  (Exhibit E, p. 5-6).

When it addressed this issue at the state level, the state habeas court concluded the challenged statutes did not violate the Establishment Clause, and did not constitute cruel and unusual punishment.  Specifically, the state court concluded the actual purpose of the statutes was likely the secular purpose of establishing an appropriate penalty for certain crimes, that the primary effect of the statutes was penal, not religious, and was not to advance Protestant Christian beliefs over other faiths.  The state court further held that the fact that the statutes are consistent with the tenets of a particular faith does not render them unconstitutional. (SHTr.:354-55).

These conclusions were not an unreasonable application of federal law.  In *Edwards v.*

*Aguillard*, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), the Supreme Court addressed a situation where it was alleged a statute had no identified secular purpose.  In *Edwards*, the Court explained that the first prong of the *Lemon* test asks whether the government's actual purpose was to endorse or disapprove of religion and that such an intention may be shown either by the promotion of religion in general or by the advancement of a particular religious belief.  *Id.* at 585; *see also Wallace v. Jaffree*, 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).  The *Edwards* court also stated that a reviewing court should normally be deferential to a State's articulation of a secular purpose for a law, so long as that purpose is a sincere one and not a sham.  *Edwards*, 482 U.S. at 586-87.

In this case, petitioner is essentially arguing that the Texas statutes codifying capital murder as a punishment for certain types of murder have no identified secular purpose. However, petitioner has pointed only to the closing arguments made in the Texas House of Representatives when these statutes were voted into law in 1973 to support his claim.  Missing from the record are any transcripts of the actual debate, much less transcripts from legislative committee meetings where, presumably, various provisions of the statutes were actually written and discussed.  Thus, no record of the actual, stated purpose of the statutes is before this Court. Even when looking only at the closing statements, where proponents of the death penalty did cite the Bible as support, it is clear that such citation was in response to quotes from the Bible by those opposed to the death penalty.  Accordingly, there is no evidence that the actual purpose of the enactment of the death penalty statutes was the endorsement of religion.

As the Texas Court of Criminal Appeals noted when it addressed an identical claim:

> In our view, it is at least as likely that the Legislature's actual purpose in enacting
> the statutes was the secular one of establishing the appropriate penalty for certain

> heinous crimes, and that the legislators acted as they did because they held one or more of the following reasonable, secular beliefs:  (1) the death penalty is the only proportional punishment for certain crimes; (2) the death penalty ensures, at a minimum, that the offender will never harm anyone again; (3) the death penalty may deter some persons (professional criminals and those already imprisoned for life), and possibly others, from committing murder; and (4) life imprisonment without parole is not a viable alternative to the death penalty because (a) capital offenders are a danger to others in the prison environment, (b) persons imprisoned literally for life have little incentive to behave properly, and (c) it is undesirable, costly, and possibly inhumane to keep persons in prison until they actually die from old age or disease.

*Holberg v. State*, 38 S.W.3d 137, 140 (Tex.  Crim.  App.  2000).[5]  In *Edwards*, the Supreme Court invalidated a law requiring that "creation science" be taught in any public school where the theory of evolution was taught because the Court could conceive of no secular purpose for that law.  *Edwards*, 482 U.S. at 593-94.  Such is not the case here.  There are a number of secular purposes for the law, and petitioner has not presented persuasive evidence that the state habeas court's conclusions that the challenged statutes do not violate the Establishment Clause, and therefore do not constitute cruel and unusual punishment, are an unreasonable application of federal law.  Accordingly, petitioner's sixth and seventh grounds for relief are without merit, and it is recommended that they be denied.

E.

<u>Right to Testify Claim</u>

In his tenth ground for relief, petitioner asserts he was denied his right to testify at the punishment phase of the trial in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments.  Petitioner contends he wanted to testify at the punishment phase of the trial, and that he expressed his desire to his trial counsel, but that he was not permitted to testify.

---

[5]It is noted there is some irony in the concept that it is more humane to execute an individual than keep him in prison until he dies.

In *Rock v. Arkansas*, 483 U.S. 44, 51-53, 62, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), a case involving Arkansas' *per se* exclusion of all post-hypnosis testimony, the Supreme Court held that criminal defendants have a right to testify in their own behalf under the Fifth, Sixth, and Fourteenth Amendments to the Constitution and that the Arkansas rule infringed on the constitutional right of defendant Rock to testify on her own behalf, as this rule excluded much of her own testimony at trial. *Id.* at 62. The Fifth Circuit has held that the appropriate vehicle for a claim that trial counsel has interfered with a criminal defendant's right to testify is a claim that counsel rendered ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001), *citing United States v. Brown*, 217 F.3d 247, 258-59 (5th Cir. 2000). Under the *Strickland* test, in order to prove his counsel was ineffective, a defendant must prove, by a preponderance of the evidence, both that counsel's performance was deficient and that this deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687.

At the state habeas level, petitioner submitted a sworn affidavit in which he asserts that:

> After I was convicted of capital murder..., I directed my trial attorneys, C.J. McElroy and Walt Weaver, that I desired to testify in the punishment phase of my trial to talk about my life and to express remorse to the victim's family. I was not allowed to do so. I was unaware that I could have forced my attorneys to allow me to testify or that I could have asked the Judge to allow me to testify.

(SHTr.:104). In turn, the State submitted a sworn affidavit from trial counsel C.J. McElroy. In this affidavit Ms. McElroy states that when she first met with petitioner after being appointed, she advised him he had the right to decide what plea to enter and had the right to testify at trial. She further asserts that petitioner never expressed a desire to testify at trial. She also states that petitioner did express a desire to tell the family of the victim that he was sorry and was told by

counsel that, should the State call family members as witnesses, he could express remorse at that time.  McElroy also asserts in her affidavit that petitioner was very depressed and had expressed a desire to plead guilty so that the family would not have go through a trial, and that trial counsel had to explain to petitioner that there would still be a trial.  Finally, McElroy states that, had petitioner expressed a desire to testify, she would have counseled against such a course of action because:  1) petitioner had difficulty controlling himself during trial and at one point screamed and cursed at a witness and knocked the defense table off-balance.  Further, given his vacillating moods, placing petitioner on the stand to be confronted with the graphic nature of his crime would have been risky; 2) petitioner had had encounters with the police since he was ten years old with which he could have been cross-examined; 3) the State's case against petitioner was very "tight"; 4) although he had not been indicted for the crime, petitioner was responsible for the death of another man, a subject about which he would have been subject to cross-examination; 5) even if petitioner did not have an outburst during his testimony, it was a distinct possibility that he would have fallen into a depressed state and requested that the jury sentence him to die; and 6) petitioner's desire to express remorse did not need to occur by him testifying at trial.

When addressing this issue at the state level, the state habeas court made factual findings that McElroy had advised petitioner of his right to testify, that petitioner had never expressed a desire to testify, that petitioner did express a desire to inform the victim's family that he was sorry, and that McElroy determined that it would have been very unwise for petitioner to testify in the face of overwhelming evidence, especially given his emotional condition and his outburst at trial. (SHTr.:343-45).  The state habeas court concluded that McElroy had rendered reasonably

effective assistance of counsel by informing petitioner that he had the right to testify and had rendered reasonably effective assistance of counsel by not otherwise advising petitioner to testify, given his emotional state, his inability to control himself during trial, and the facts about the instant case and other offenses about which he would have been subject to cross-examination. (SHTr. 361-63).

Although respondent acknowledges a criminal defendant has an absolute right to testify in his own behalf, respondent appears to argue that trial counsel's affidavit and the observations made by counsel recited therein establish counsel's decision not to allow Roach to testify during the punishment phase was not only reasonable, but was prudent and that Roach has not met his burden of showing deficient performance.  Respondent then alternatively argues Roach failed to show prejudice, that is, Roach failed to establish a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.  If, in fact, respondent is saying petitioner Roach failed to show deficient performance because counsel's decision to keep him off the stand was sound trial strategy even if Roach had expressed his desire to take the stand, then the Court does not agree that petitioner has failed to show deficient performance.  If a criminal defendant has an absolute right to testify, then counsel may not interfere with that absolute right.  Counsel, of course, should advise the defendant about testifying, and the ramifications of testifying, but, in the end, it is the defendant's call.

Petitioner Roach, however, has failed to show the state habeas court's decision denying relief was an unreasonable determination of the facts in light of the evidence presented, or was contrary to clearly established federal law.  The state court had before it both Ms. McElroy's affidavit as well as petitioner Roach's affidavit and determined Roach was not entitled to relief.

It appears the state habeas court adopted counsel's version that Roach never expressed a desire to testify.  Absent expressing a desire to testify at the state trial, it cannot be said that trial counsel was ineffective.

In addition, as respondent alternatively argued, even if deficient performance has been shown, because Roach did request to testify but was not allowed to by his trial counsel, petitioner has failed to show any prejudice under *Strickland*.  The Fifth Circuit has held that a criminal defendant has met the first prong of the *Strickland* where the record before the court is that the defendant informed his trial counsel of his desire to testify at trial, but was prevented from doing so by counsel.  *United States v. Mullins*, 315 F.3d 449, 455-56 (5th Cir. 2001), *cert. denied*, 124 S.Ct. 2096 (2004).  In *Mullins*, however, the Fifth Circuit also held that the prejudice standard of *Strickland* had not been met because, had Mullins been allowed to take the stand according to his wishes, the government would have been permitted to cross-examine him about his extensive criminal history and drug use and there was, therefore, no reasonable probability that the testimony of a convicted felon regarding the charged offense would have been believed when contradicted by the arresting officer.  *Id.* at 456.  In this case, given petitioner's lengthy criminal history, including the fact he killed another man prior to the murder for which he was convicted, and the brutal nature of the murder and rape of the victim, as well as petitioner's previous violent outburst at trial, there is no reasonable probability that, had petitioner testified at trial and expressed his remorse to the victim's family, he would not have received the death penalty.  This claim is without merit, and it is recommended that it be denied.

F.
## Attorney Conflict of Interest Claim

In his eleventh and final ground for relief, petitioner contends appellate counsel had an actual conflict of interest which deprived him of his Sixth Amendment right to the effective assistance of counsel.  Petitioner asserts his appellate attorney accepted employment with the Potter County District Attorney's office immediately after representing him which created an actual conflict of interest.

In *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Supreme Court announced the general rule with respect to conflicts of interest between attorneys and clients.  In that case, a state defendant had filed a federal writ of habeas corpus in which he alleged his trial attorney was operating under a conflict of interest because he represented Sullivan and his two co-defendants in three separate criminal trials.  The Supreme Court held that the mere *possibility* of a conflict of interest is insufficient to overturn a conviction.  Rather, in order for a criminal defendant to demonstrate a violation of the Sixth Amendment which would entitle him to relief, the defendant must establish his attorney was actively representing conflicting interests and that an actual conflict of interest adversely affected the attorney's performance.  Once a criminal defendant demonstrates such a conflict, prejudice is presumed. *Id.* at 349-50.  Since *Culyer* was handed down, the Supreme Court has clarified that a defendant is not entitled to a presumption that the prejudice prong of the *Strickland* standard has been met where a conflict of interest on his attorney's part existed, unless that conflict adversely affected the attorney's performance.  *Mickens v. Taylor*, 535 U.S. 162, 172-73, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002).

In *Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995), *cert. denied*, 511 U.S. 1151 (1996), the Fifth  Circuit held *Cuyler v. Sullivan* was only applicable to situations where an attorney was

representing multiple interests.  The Fifth Circuit further held in *Beets* that the *Cuyler* standard

for ineffective assistance of counsel did not extend to conflicts between an attorney's personal

interest and his client's interest, as those types of situations were best analyzed under the

*Strickland* standard for ineffective assistance of counsel.  *Beets*, 65 F.3d at 1269-72.  The Fifth

Circuit has also held that, in order to show there has been an adverse effect, a petitioner must

show "some plausible defense strategy or tactic [that] might have been pursued, but was not,

because of the conflict of interest."  *Hernandez v. Johnson*, 108 F.3d 554, 560 (5th Cir. 1997),

*quoting Perillo v. Johnson*, 79 F.3d 441, 449 (5th Cir. 1996).

In the instant case, the record before this Court reveals Ms. Candace Norris was

appointed to represent petitioner on direct appeal on May 20, 1999.  (R. 28:10).  She accepted

employment as an Assistant District Attorney for Potter County beginning on January 1, 2000.

(SHTr.:258).  Ms. Norris filed an appellate brief on petitioner's behalf on February 2, 2000.

(SHTr.:266).  According to an affidavit submitted by Ms. Norris during the state habeas process,

however, this brief had been completed on December 31, 1999, but was not filed until after she

began work as an assistant district attorney because the brief was not due until February 5, 2000,

and she did not want to trigger any deadlines that might affect petitioner by filing the brief on an

earlier date.  The certificate of service on the brief states the brief was completed on December

31, 1999.  (SHTr.:259, 280).  Ms. Norris further stated in her affidavit that she did not perform

any work on petitioner's brief after she began her employment with the District Attorney's

office, that she did not represent the District Attorney's office in any matter related to petitioner,

that no confidential materials concerning her representation of petitioner were ever brought to

the attention of the District Attorney's office, and that her employment with the District

Attorney's office had no adverse affect on petitioner's interests.  (SHTr.:259).  The record

indicates petitioner was represented by other counsel, Mr. John Bennett, after Ms. Norris began

working for the District Attorney's office, and that Mr. Bennett filed a supplemental brief on

petitioner's behalf with the Court of Criminal Appeals on May 19, 2000, raising three additional

points of error.  Mr. Bennett also filed a reply brief on August 23, 2000.  (SRTr.:296-319, 323-

30).

The state habeas court addressed this issue and concluded that Ms. Norris did not actively

represent conflicting interests, did not engage in dual or successive representation, and was not

required to choose between advancing her client's interests and the interests of the State.  The

state habeas court also concluded that even had there been a conflict of interest, there was no

harm shown to petitioner. (SHTr.:364).  These conclusions are not an unreasonable application

of federal law.

While the better approach would have been for petitioner's appellate counsel to fully

disclose the fact she had accepted employment as a prosecutor even though her employment was

not to immediately begin, the record before this Court does not entitle petitioner to relief.

Assuming, for purposes of argument, that the mailing of the brief after January 1, 2000, was an

actual conflict of interest, petitioner Roach has failed to show how this conflict of interest

adversely affected his representation on direct appeal.  Roach attempts to show adverse effect by

stating appellate counsel failed to utilize an additional month to prepare the appellate brief and

alleges the appellate brief was deficient because it only contained seven points of error and

consisted of approximately 34 pages.  These allegations do not show any adverse effect on

petitioner's direct appeal.  Roach has not specified any additional points of error which should

have been raised in his direct appeal, nor has he set forth any additional arguments which should

have been made with respect to any of the seven points of error which were raised on direct

appeal.  Roach's claim of ineffective assistance of appellate counsel fails because he has not

shown his direct appeal suffered any adverse consequences as a result of the conflict of interest

alleged.  Had the appellate brief been mailed upon its completion on December 31, 1999, then no

actual conflict of interest would have existed because appellate counsel would never have been

representing adverse interests simultaneous to her employment as Roach's appellate attorney of

record.[6]

Accordingly, because the state court's decision overruling this issue on state habeas

review is neither contrary to nor an unreasonable application of Supreme Court law, this claim is

without merit.  It is therefore recommended that this claim be denied.

## VII.
## REQUEST FOR EVIDENTIARY HEARING

Petitioner has requested an evidentiary hearing in this Court.  A habeas petitioner is not

necessarily entitled to an evidentiary hearing in federal court.  Rather, to be entitled to such a

hearing, a habeas petitioner must show either a factual dispute which, if resolved in his favor,

would entitle him to relief *or* a factual dispute that would require development in order to assess

the claim.  *Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir.), *cert. denied*, 531 U.S. 951 (2000);

*Robison v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998).  The majority of petitioner's claims are

---

[6]The fact that she may have interviewed with negotiated employment with the prosecutor's office prior to December 31, 1999, might give rise to a potential for a conflict of interest, but such would not constitute an actual conflict of interest.  It is only because counsel waited until she had been employed as a prosecutor for the month of January before mailing the appellate brief for filing that the conflict issue arises.  Assuming the act of mailing the appellate brief for filing, and the fact that Ms. Norris remained counsel of record for petitioner during the month of January while she was also employed as a prosecutor was a conflict of interest, there has not been any adverse effect shown as a result of such conflict.  Petitioner Roach's Sixth Amendment rights were not violated to the extent that he is entitled to federal habeas corpus relief.

either based on a record that is not in dispute or are legally-based, rather than factually-based,

claims.  Moreover, this Court has accepted all of petitioner's non-record evidence in considering

petitioner's claims and ruled on these claims accordingly, assuming all of petitioner's non-record

evidence to be accurate.  Petitioner is not entitled to an evidentiary hearing.


## VIII.
## RECOMMENDATION

It is the RECOMMENDATION of the United States Magistrate Judge to the United

States District Judge that the federal habeas corpus application filed by petitioner TONY

ROACH be DENIED.


## IX.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a file-marked copy of this Report and

Recommendation to petitioner and to counsel of record for respondent by the most efficient

means available.

IT IS SO RECOMMENDED.

ENTERED this 9th day of September 2005.



CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE


## * NOTICE OF RIGHT TO OBJECT *

Any party may object to these proposed findings, conclusions and recommendation.  In
the event a party wishes to object, they are hereby NOTIFIED that the deadline for filing
objections is eleven (11) days from the date of filing as indicated by the file mark on the first
page of this recommendation.  Service is complete upon mailing, Fed. R. Civ. P. 5(b), and the

parties are allowed a 3-day service by mail extension, Fed. R. Civ. P. 6(e).  Therefore, any objections must be <u>filed</u> **on or before the fourteenth (14th) day after this recommendation is filed**.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b); R. 4(a)(1) of Miscellaneous Order No. 6, as authorized by Local Rule 3.1, Local Rules of the United States District Courts for the Northern District of Texas.

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).